Samonte v. Bauman Please proceed, counsel. Amith Kirlikar, Jr. May it please the Court, my name is Amith Kirlikar, and I represent the plaintiff appellant, Lael Samonte. With the Court's permission, I'd like to focus my argument today on Mr. Samonte's claims against Dr. Bauman. Specifically, the question before the Court is whether Dr. Bauman showed that Mr. Samonte presented no evidence that would create a genuine issue of fact as to whether there was deliberate indifference towards his pterygium and cataract. Both the pterygium and cataract are eye conditions that lead to pain and, if not treated, deterioration of vision in one's eyes. I don't think cataracts lead to pain. I believe, Your Honor, that in the excerpts of record, there is evidence which indicates that cataracts do involve some kind of pain in the eye. And they do they not? From medical providers rather than was there anything from the medical providers that say cataracts result in pain? If you would give me one second, Your Honor. I think the other condition, I can't pronounce it, but I think that it may cause pain, but cataracts don't, so let's move on. In any case, they do cause deterioration of vision, which would qualify them as serious conditions under this Court's jurisprudence. And, in fact, neither the district court nor the briefs in this case seem to contest the seriousness of Mr. Simante's conditions. But the issue is whether or not there was deliberate indifference. Correct, Judge Rawlinson, and that is where I'd like to proceed. This Court's jurisprudence in cases such as Jett and Hunt indicate that deliberate indifference is constituted when there is delay that results in harm to the untreated patient, even if this harm is not substantial. In fact, in Jett and in Hunt, delays of only two and a half and three months respectively constituted deliberate indifference. Well, they had different conditions. Looking at the facts in this case, there was quite a delay before Dr. Baumann came on board, but there's nothing you can do about that. So we now look at what she did. And just as soon as they were able to get an ophthalmologist, he had an appointment. Isn't that right? He did have an appointment, Judge Fletcher. He had an appointment in October of 2002. He was diagnosed with the pterygium and a cataract at that point. However, when he complained about the condition in his eye in June 2003, a whole year passed before he even saw an optometrist again. That's a whole year in which he repeatedly complained of the pain in his right eye. And also he What happened in the interim? Was he given any direction regarding what to do? Wasn't he told to get bifocals or there was nothing told to him in that year? They saw him and nothing happened? In that year, Your Honor, nothing happened. He was seen by the general physician, but the general physician's notes, while they are hard to read, seem to indicate only, seem to only confirm that he has a pterygium in his eye. And when he was prescribed bifocals, Mr. Simante makes clear that he told the optometrist, Dr. Nakamoto, that he couldn't afford bifocals. Therefore, the bifocals themselves were a futile remedy, and I would submit that they merely prolonged the delay in treatment of his pterygium. Wasn't there evidence – well, I suppose your question is whether there's a conflict. But there were statements that we don't think that his condition has progressed to the point where it is yet a candidate for surgery. With respect to his cataract, Judge Canby, that is true. With respect to his cataract, Judge Bowen entered an affidavit in which she – or a that the progress of his cataract had not yet reached the point where surgery is an option. With respect to the pterygium, however, there was never any evidence entered. It's referred to in Dr. Bowman's brief, but there is not a single record citation to which she refers where that judgment was made. There's some reference in the papers to the fact that when they finally did operate on that condition, it was because it appeared to be growing. In other words, that it wasn't stable. At the time they operated, they had the feeling that it had – it seemed to be getting worse. That's correct, Judge Canby. What's the year – you're saying there was a delay of one year. From what date to what date are you referring to? June 2003 to June 2004, Judge Rawlinson. And so June 2003, he was seen by whom? By no one. He was – there was a sick call, so he was seen by – pardon my ignorance – whichever prison official, I believe it's a nurse, administers the sick call. Then he actually saw a doctor, a general physician, Abruzzese, I think, in September of 2003. And then he didn't see the optometrist until June 2004. And then only a month after that, when he finally saw an outside physician, Dr. Pang, was pterygium surgery recommended. Even at that point, Dr. Baumann sat on that recommendation for two months, and his pterygium surgery was not approved until September 2004. Now, also in September 2004, Dr. Soriano scheduled Mr. Simone de for cataract surgery. But Dr. Baumann explicitly overruled that scheduling. And this is, Judge Kanvey, where we get back to your previous question about whether there was some judgment that his condition had not advanced properly for surgical treatment. Now, I would submit that Dr. Baumann's overruling of Dr. Soriano's scheduling does not rise to the level of a good-faith dispute between physicians. Here we have Dr. Baumann, who never personally inspected Mr. Cimonte, who is not a specialist in the field, overruling the decision of someone who is. Even if one were to assume there was a bona fide dispute between two physicians on this issue, this Court has announced in Jackson v. McIntosh that if the prison official's judgment is medically unacceptable, then that would still give rise to a deliberate indifference claim under the Eighth Amendment. Now, so let me ask you this. In the Hunt case, as a result of the delay, there was documented evidence that Mr. Hunt was in severe pain, that his teeth were unusable, and the prison would not give him soft food to eat, so he was unable to eat. How do these circumstances compare to that case? I would say they line up fairly well with this, with the instant case, Judge Rawlinson. First of all, we do have Mr. Cimonte submitting repeated grievances that he is in pain. He claims that his eyes are getting worse. He claims there is discharge that he has trouble seeing. Also, contrary to Judge Baumann's representation – sorry, to Dr. Baumann's representations in her brief, the tooth condition in Hunt was chronic, just like the eye condition that Mr. Cimonte is facing here. And finally, we see the refusal to do anything about the tooth condition is paralleled in the refusal to do anything about Mr. Cimonte's pterygium and cataract. And getting back to the cataract, the point that I was making was that even if you think that there's a good-faith dispute between Dr. Baumann and Dr. Soriano over what to do with this cataract, he should – Mr. Cimonte should have the chance to show that the refusal to perform surgery on his cataract for almost two years, until April 2006, was medically unacceptable. Mr. Cimonte has already subpoenaed the testimony of Dr. Soriano and Pang, and he should be allowed to obtain that discovery. I see I only have two minutes remaining, and I'd like to reserve the rest of my time for rebuttal unless the panel has any other questions. Thank you. Roberts, if it pleases the Court, Arthur Roque on behalf of Dr. Baumann. I'll focus on the issue concerning the medical conditions and timing. As the Court has already noted, my client, Dr. Baumann, became the medical director in July of 2002. And the patient was referred and examined by Dr. Nakamoto, I think, on October the 25th of 2002. And at that point, two conditions Dr. Nakamoto noted. One was a pterygium, that's how it's pronounced, and the other are cataracts. Both of those conditions were noted, and the patient was seen on multiple occasions. Now, the record is filled with Mr. – with the appellant's statement to the effect that he needed some kind of treatment because of conditions in his eyes. And every time he was seen for his pterygium, and it was followed, what you do is you follow it because it could grow, and if it grows, it can irritate or it can – if it grows over the front of the eye, it can obstruct your vision. So they watched that. The next time he was evaluated for that again in June and September of 2003, and there was a note that it was going to be followed, meaning watched, and that's in the record. When – and so the pterygium we know was followed, and we know that Dr. Pang saw the He said treatment can be watching or it can be surgery. And so, again, he offered either one. And that pterygium situation, unlike any of the cases counsel has cited, was not a situation in which the only mode of treatment was surgical. They have artificial tears. They recommend sunglasses because it's something the sun can bother. Similarly, the cataract condition, for just a moment, is a slow loss of opacity of the lens of the eye. And some of us have it and get eyeglasses for it. And then when useful vision, which can't be corrected well enough, reaches a certain point, surgery takes place. So if you look at the record, what we have is physicians interacting with this gentleman for both conditions, following it, and not one entry in any of the records suggests giving the patient medication for pain. Not one. There is not one statement in the record that this patient's condition needs to be operated on or some irreversible condition will result. There's not one statement in the record that there is an urgent or emergent need to intervene medically. The physicians each pointed out that there are alternative ways to approach these. And it's not up to the prisoner to declare which one he's going to get. And these judgments were made by physicians, and it's in the record. The cataract surgery, there's a comment on February 14, 2005, from Dr. Nakamoto that this is not a surgical case. It hasn't reached that stage of progression. There is a note on September 29, 2004, from Dr. Soriano regarding the pterygium, that it's progressive, and surgery was taken care of in two months from then. So the point being that unlike other cases where a prisoner has an infection, has a pathological process which is going to compromise their life, this particular set of circumstances involved two conditions that could be non-surgically or surgically treated. Those recommendations were made. Dr. Bowman, exercising appropriate evaluation, made her decision. What do we do about the fact that he didn't have the money to get the bifocals? That was never raised. If he had said to somebody, it came up for the first time at the hearing, the record indicates that he was offered this. And if you go to the ER 150, that's part of the record. That's Dr. Nakamoto doing the prescription. He gave him a prescription for lenses. And Dr. Pang also gave him a prescription for lenses. And there's nothing in either of those documents that says the patient could not pay. Doesn't he say that, though? Didn't he say, I told Dr. so-and-so when he... That was said at the hearing, and that's part of the record. But it's not in the record that Dr. Nakamoto wrote down. What he wrote down is patient refuses. And that's what it says in the record. So that came up for the first time in the hearing. And so if Dr. Bowman had been told the patient can't afford to buy this, she would have done whatever... Some steps would have been made, just like any prescription, because a prescription for bifocals is like a prescription for heart medication. Well, your point then is that even though he may have told the examining doctor, nobody told Dr. Bowman, is that right? Correct. Dr. Bowman didn't have anything suggesting that he couldn't afford to pay. All she had was a note from the doctor saying he refused. And again, Dr... He was told repeatedly he needs glasses, he's got to wear glasses. And all of his visual examinations demonstrated that his best corrected vision all the way up until February of 2005 was 20-25 in both eyes. Which means that he may not have had perfect vision with his glasses off, but pretty close to perfect when he had them on. And that was tested multiple times by different people. So under the circumstances, we submit that Dr. Bowman, with the multiple examinations that were taking place on this gentleman during her watch, was certainly not deliberately indifferent in any way with respect to this particular gentleman. Any questions? It appears not. Thank you, counsel. Rebuttal. Counsel, while you're coming up, I wanted to ask you about the transfer issue. You didn't address that during your presentation. May I ask you that he's been transferred from the Florence Correctional Center, which is where you had your issue. Is that still an issue? It is still an issue, Judge Rawlinson. Mr. Cimonte has indicated to me, obviously, this transfer to Red Rock happened after the appeal had already gone up. So he didn't have a chance to amend his complaint, to substitute a claim based on Red Rock instead of Florence, or make any arguments about that down below. However, he's told me that he still feels his life is in danger in Red Rock. And I believe that under the Nelson case, his claim for injunctive relief is not mooted. Rather, the case should be remanded so that he can amend his complaint, if he wishes, to make a claim based on the conditions at Red Rock as opposed to Florence. So he has enemies wherever he goes? Is that pretty much the ---- I don't know, Judge Rawlinson. In my discussions with him, he claims that he has enemies at Red Rock as well. That's all I can say. So is the remedy for him to get back to Hawaii whenever he feels threatened in any prison anywhere? I'm not suggesting that's the remedy, Your Honor. I don't know whether there's another facility in Arizona that would ---- in which he does not have enemies. But that is the specific relief that he requested. And ---- He could also start a new action if he really has a claim for danger there. That's true, Judge Fletcher. I think that's a perfectly viable alternative solution. But getting back, I just wanted to make a couple of points in response. And the first one was that Dr. Baumann contends that Dr. Pang never recommended pterygium surgery. Now, first of all, if we look at page 147 of the record, and I'll allow you to look at that at your own leisure, Dr. Pang clearly says that he would have pterygium removal surgery for Mr. Simante. That he would what? That he would have the pterygium surgically removed for Mr. Simante. But more than that, Dr. Baumann's own brief in the district court on pages 96 and 97 of the excerpts of record say that Dr. Pang recommended pterygium removal surgery. I don't think there's really any dispute in the record as to whether Dr. Pang did recommend the pterygium removal he did. At what time was that? When did he do that? In September ---- I'm sorry, in July 2004. He said would offer removal, but he didn't say it was required. I believe that taking all inferences in favor of Mr. Simante, as should be done on summary judgment, that constitutes a recommendation for surgical removal. And again, I'd like to point out in pages 96 to 97 of the record, which is in Dr. Baumann's brief in the district court, she says Dr. Pang did recommend removal of the pterygium. And those are her exact words in her brief. The other point I'd like to make is that Dr. Baumann contends ---- Well, the rest of the brief said neither mandated removal. So ---- The rest of the brief in the district court level, Judge Rollins? Yeah. On page 96, it says, however, neither Dr. Pang nor Dr. Soriano mandated surgical removal. So there's a difference between recommending, which is nice, and mandating, which is necessary. I think, Judge Rollinson, there's two points you made in response to that. The first is that Dr. Pang is an outside physician, can't mandate anything for Mr. Simante. So in the end, all he can really do is give his recommendation. I think the second point is, it wasn't as if Dr. Baumann took Dr. Pang's recommendation and said, well, instead of offering pterygium surgery, I will do something else. Her own affidavit said that for two months, she simply did nothing. Well, you were the one who referred to this page 96 and 97. So I was just completing the statements that were made. I think that if a physician says surgery is required or the condition will deteriorate, that's a different thing than saying I recommend surgery. I see a difference there. I think under certain circumstances, that would be true, Judge Rollinson. I do think, though, that, again, taking inferences in favor of Mr. Simante, the fact that Dr. Pang was the outside physician and couldn't mandate anything should lead to an inference that he was saying that surgical treatment was the right course of action in this case. I did also want to briefly respond to Dr. Baumann's contention that the pterygium was being monitored this whole time. Between June 2003 ‑‑ I'm sorry, between October 2002 and June 2003, he says the pterygium was being followed, but, again, there's no record citations to that effect. And also, the fact that he was seen in September 2003 does not abate the deliberate indifference claim, because as this Court maintained in Lopez, simply being seen by a doctor is not enough to stop a deliberate indifference claim. There must actually be some treatment involved. Is there any evidence in the record regarding how often a cataract patient is seen? Is it more often than once a year? Is it every few months? Is it every few weeks? Is there anything in the record against which we can measure to see? Maybe it's ‑‑ I don't know. Maybe it's usual to see a person every ‑‑ vision exams are every one or two years generally. There is no evidence with that kind of medical detail in the record, Your Honor. And I would say that at the very least, that points up the need for Mr. Cimonte to gather his additional discovery, as he's already requested the testimony of medical witnesses. I see that my time has expired, so if I have more questions. Thank you. Thank you to both counsel. The case just argued is submitted for a decision by the Court. Well, the thing about it is when you first came to the podium, you know, you have to ‑‑ if you're going to split time, you have to let that be known at the time the first person comes up to argue. We weren't given any indication that anyone else was going to argue the case. So it's a responsibility ‑‑ if there are two attorneys on a case, it's the responsibility of those attorneys to let us know if someone else is going to argue the case.  But Mr. Rocha represented Dr. Bowman, and the governor's line, 10 minutes in the original notice, and I was just waiting, but Mr. Kirkler just showed up for rebuttal. But there's really nothing to rebut. The governor ‑‑ there's been no argument against the governor. Yeah. All right, Your Honor. All right. Thank you. In the future, if you come for argument and you want to argue, let that be known, because your name is not ‑‑ your name is not listed on here. It was listed when I checked in, Your Honor. Where is it? It's on the next page? It's not on the page. So there's no way I would have known that you wanted to argue. So in the future, just for future reference, if you want to argue, make sure that you approach the podium and let us know, and then we'll resolve it. But there was no argument made regarding the governor. So I think you're fine. We're kind of careful to police the first speaker to allow time for the second one, if we know about it. We'll apologize, but if something comes up where an issue is raised, we will contact you. But I think we'll be fine with the information we have. All right. Thank you. The next case on calendar for argument is Hosea v. McCasey.
judges: Fletcher, Canby, Rawlinson